**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION – CINCINNATI**

| | | |
|---|---|---|
| LEE BRIGGS, | : | Case No. 1:18-cv-552 |
| | : | |
| Plaintiff, | : | Judge Matthew W. McFarland |
| | : | |
| v. | : | |
| | : | |
| UNIVERSITY OF CINCINNATI, | : | |
| | : | |
| Defendant. | : | |
| | : | |

---

## ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (DOC. 26)

---

This case is before the Court on the Motion for Summary Judgment (Doc. 26) filed by Defendant University of Cincinnati ("UC"). The motion is fully briefed and ripe for review. (*See* Docs. 26, 33, 36.) As no genuine issues of material fact preclude judgment in UC's favor, its motion is **GRANTED** and this case shall be **TERMINATED** on the Court's docket.

### FACTS

**A. Plaintiff begins his employment with UC in November 2011.**

On November 28, 2011, Plaintiff Lee Briggs began his employment with UC as a Benefits Generalist in the Benefits Department making $39,000. (Doc. 4 at ¶11; Doc. 12 at PageID# 52.) Before joining UC, Plaintiff was terminated from a benefits administrator position at Cincinnati Children's Hospital.

**B.  Stidham hires Plaintiff as a compensation analyst in October 2013.**

At UC, the Sr. Associate Vice President & Chief Human Resources Officer ("CHRO") oversees Central HR.  There are many divisions or departments within Central HR, which are managed or supervised by different directors or department heads. These divisions or departments include Compensation, HR Operations, Labor Relations, Talent Acquisition, Benefits, and Student Success.  (Doc. 23 at ¶ 2.)

In October 2013, Defendant Ken Stidham, UC's Associate Director of Compensation, hired Plaintiff—with the approval of then CHRO Erin Asher—as a compensation analyst with a salary of $43,000.  The parties dispute whether Plaintiff had significant compensation experience when he was hired into HR.  Plaintiff claims that he performed similar work at Cincinnati Children's Hospital and Buck Consultants, another one of his prior employers.  (Doc. 12 at PageID# 171-174.)

The budget for the compensation analyst position was $43,000, and Stidham believed that he was not going to be able to hire an employee with compensation experience for that salary.  (Doc. 23 at ¶ 3; Doc. 12-2 at PageID# 328.)

**C.  Stidham hires Cassandra Wittwer as a Compensation Analyst in July 2015.**

In June 2015, there was a vacancy in the second compensation analyst position. Cassandra Wittwer, a senior HR coordinator with the UC College Conservatory of Music (CCM), applied for the job.  She came with outstanding recommendations from CCM employees, and others in Human Resources highly recommended her.  Stidham, with the approval of then interim CHRO Peg Buttermore, hired Wittwer as a compensation analyst with a salary of $53,000.   Wittwer started working as a

2

compensation analyst on July 27, 2015. (Doc. 23 at ¶6; Doc. 12 at PageID# 57-58.) When Stidham hired her, Wittwer had been employed at UC for over 10 years,[1] she had her bachelor's degree, her previous CCM senior HR coordinator salary was $48,066.48, and she told Stidham that she would not take the compensation analyst job for less than $53,000 per year. Plaintiff admits that UC policy requires that a 5% or more salary increase must accompany a promotion. (Doc. 12 at PageID# 58.) Stidham believed that this policy applied to Wittwer's hire and UC had to pay her at least 5% more than her CCM salary, which was already more than Plaintiff's salary. (Doc. 23 at ¶ 6-7.)

**D. Plaintiff sends Stidham an equity request form asking for a salary increase.**

On August 31, 2015, Tamie Grunow became the CHRO. She was a new hire at UC. UC's pay equity adjustment policy says that an employee, supervisor, department unit head, or the Compensation Department may request in writing a pay equity review, and the Compensation Department must conduct a pay equity study or market analysis review and issue a written determination. (Doc. 23 at PageID# 1293.) The policy says that an employee's overall performance rating may have a direct impact on current salary and the ability to receive an equity review increase. (*Id*.)

UC has a standard equity review request form that must be fully completed—including the required pay equity study or market analysis review—and approved by a Sr. VP/VP designee before an employee may receive an equity increase. (Doc. 23 at ¶ 9; Doc. 12 at PageID# 64.) On September 16, 2015, Plaintiff emailed Stidham an equity

---

[1] Plaintiff notes that Wittmer began her employment at UC as a student and did not become a full time UC employee until 2008. (Doc. 20-1 at PageID# 1128.)

request form asking for a salary increase. Plaintiff included on the form information about his current job and salary but left the remainder of the form blank. Stidham kept Plaintiff's equity request form and did not give it to Grunow or anyone else at UC.[2] Stidham did not complete the form, run the pay equity study or market analysis, or issue a written determination on Plaintiff's equity request. Stidham told Grunow that Plaintiff requested an equity adjustment of his salary, but also told her that he was "still working with [Plaintiff] on completing – of understanding and learning the job." (Doc. 20 at PageID# 907.) Grunow never gave Stidham a yes or no, but instead said, "We'll see" and "Let me think about it." (Doc. 23 at ¶ 12.)

**E. Plaintiff's job performance is inconsistent.**

At times Stidham had problems with Plaintiff's job performance, skills, productivity, and leaving work early. Plaintiff disputes this fact, but even the evidence that Plaintiff cites shows he did not always meet expectations and had mixed reviews within the company. (*See* Doc. 29 at PageID# 1585; Doc. 29-1 at PageID# 1699, 1711-12.) UC employees inside and outside Central HR brought to Stidham's attention mistakes that Plaintiff had made. (Doc. 23 at ¶ 14-15, 18-19, 21; Doc. 12 at PageID# 70-71, 77.) Stidham did not have problems or concerns about Wittwer's job performance, skills, productivity, or leaving work early. (Doc. 23 at ¶ 24.) In November 2015, Stidham asked for a $750 spot bonus for Wittwer because of her exceptional, outstanding work

---

[2] Plaintiff claims that Stidham provided a copy of Plaintiff's form to Grunow. (Doc. 14 at PageID# 627.) Stidham's deposition testimony is not clear on this point, but he clearly states in his affidavit that he did not provide the physical form to Grunow. It is undisputed that Stidham discussed the request for an equity adjustment with Grunow.

as a compensation analyst.  (Doc. 23 at ¶13, Ex. C.)  Plaintiff does not dispute Stidham's positive assessment of Wittwer's performance.  (Doc. 12 at PageID# 69.)

In June 2016, Stidham gave Plaintiff and Wittwer their FY16 performance evaluations.  Stidham rated Plaintiff's overall performance as "I" or "Inconsistent" and, after 2.5 years in the Compensation Department, "slightly behind the typical Compensation professional as far as technical and consultative skills."   Stidham noted that Plaintiff made errors, missed deadlines, and needed "to make strides in Microsoft Excel, multitasking, and planning his workweek" and "work on his organizational skills."  (Doc. 23 at PageID# 1312-18; Doc. 12 at PageID# 89-93.)  Plaintiff signed this evaluation and did not include any comments or objections in the employee comments section.  (Doc. 12 at PageID# 93).  Stidham gave Wittwer, the only other compensation analyst, an overall "E" or "Exceeds Expectations" rating, writing that her skills were "far advanced," and she does "outstanding work" and has "exceptional work ethic." Stidham noted that he has "received several comments from business units on Cassandra's high level of customer service and accuracy of work."  (Doc. 23 at PageID# 1319-24.)  Wittwer's "E" rating was the highest rating, and two levels above Plaintiff's "I" rating.  Plaintiff was the only employee to whom Stidham ever gave an "I" rating. (*Id.* at ¶ 26, 28, Exs. H & I; Doc.  12 at PageID# 95-96, 101-102.)  Since 2015, no Central HR employee other than Plaintiff has received an overall rating below "M" or "Meets Expectations" on his performance evaluation.  (Doc. 20 at PageID# 1030.)

### F.  Plaintiff's Inconsistent rating makes him ineligible for a 2016 bonus, but Grunow gives Plaintiff a $500 bonus.

In October 2016, Grunow asked all department heads and supervisors for their bonus recommendations for employees under their supervision. Grunow forwarded everyone in Central HR an email from her boss, which explained that only employees who had received an "E" or "M" on their FY16 performance evaluations were eligible for a 2016 bonus. Grunow added that she would not consider anyone for a bonus who was on a "PIP" (Performance Improvement Plan) or disciplined over the last year.

Stidham recommended that Wittwer receive a 2.5% bonus and Plaintiff a 2% bonus. When Grunow pointed out that the "I" rating made Plaintiff ineligible for a bonus under her boss's rule, Stidham asked Grunow to consider a one-time payment to Plaintiff because he had done a good job on a recent FLSA audit project while Wittwer was on maternity leave and he thought it would send the wrong message to give him no bonus at all. With Ambach's approval, Grunow gave Plaintiff a $500 bonus. (Doc. 23 at ¶ 29; Doc. 12 at PageID# 102-104.)

Plaintiff complained to Grunow that she had given Wittwer a $1200 bonus and had only given him a $500 bonus. At this time, he did not tell Grunow that he believed he was given a lower bonus due to his sex or race. (Doc. 12 at PageID# 105-06.)

> **G.** **Wittwer becomes the compensation & HR operations specialist on November 1, 2016, and she splits her time doing compensation and operations work.**

On November 1, 2016, Angie Sklenka, the head of the HR Operations Department, and Stidham, with Grunow's approval, reclassified Wittwer from a compensation analyst to a compensation & HR operations specialist, with no change in salary, because this new job title more accurately reflected the work Wittwer already

6

had been doing in both the HR Operations and Compensation Departments. (Doc. 23 at ¶ 31; Doc. 12 at PageID# 108.) This is consistent with Wittwer's June 2016 performance evaluation, which noted that she had been doing HR Operations work: "Cassandra was asked to perform work for Data Operations in reference to completing the back-end of the Reclassification workflow and the process was seamless. Her willingness to add this duty to her long list of primary responsibilities ensure[s] a much quicker turnaround time for workflow from Compensation to Data Operations." (Doc. 23 at PageID# 1319.) After Wittwer became the compensation & HR operations specialist on November 1, she worked about one day a week in the Operations Department, and the remainder of the time she worked in the Compensation Department. She reported to Stidham for her compensation work and Sklenka for her operations work. (Doc. 23 at ¶ 33; Doc. 12 at PageID# 109-110, 112.) From July 27, 2015, when Wittwer began working as a compensation analyst, until November 1, 2016, when Wittwer became a compensation & HR operations specialist, Wittwer and Plaintiff were the only two compensation analysts. From November 1, 2016 until his resignation in June 2018, Plaintiff was the only compensation analyst. (Doc. 23 at ¶ 34; Doc. 12 at PageID# 113.)

**H. Stidham gives Plaintiff an M rating and Wittwer an M+ rating in 2017.**

Stidham again evaluated Wittwer's performance as superior to Plaintiff's in 2017. Stidham gave Plaintiff an overall "M" (Meets Expectations) rating on his FY17 evaluation. He gave Wittwer, who had been a compensation & HR operations specialist since November 1, an overall "M+" rating.

Plaintiff again declined to include any comments or objections to his evaluation.

(Doc. 23 at ¶ 38-39 Ex. L-M; Doc. 12 at PageID# 114-15, 279.) In the summer/fall of 2017, Sklenka, the head of the Operations Department, and two other Operations Department employees left UC. UC reassigned their operations duties to other employees, rather than backfilling their jobs. (Doc. 12 at PageID# 118-19.) As part of this reorganization, on September 1, 2017, Wittwer was reclassified from a compensation & HR operations specialist to a compensation & HR operations lead. As a lead, Wittwer reviewed other employees' work for quality and to point out opportunities for improvement. Plaintiff never acted as a lead in the same manner as Wittwer. (Doc. 23 at ¶ 40.)

### I. In October 2017, Stidham recommends a 2% bonus for Plaintiff and a 3% bonus for Wittwer, which Grunow gives them.

In October 2017, Grunow again asked for Stidham's bonus recommendations for the employees who had reported to him during FY17: Plaintiff, Wittwer, and two front desk employees. Stidham recommended 2% for Plaintiff and the front desk employees and 3% for Cassandra Wittwer. (Doc. 23 at ¶ 41, 22, 37, Ex. N.) Grunow gave the employees the recommended bonuses. (Doc. 12 at PageID# 122, 155-56.) Plaintiff's 2% bonus was average. Some Central HR employees received a higher bonus while others received a lower bonus. (Doc. 12 at PageID# 122.)

### J. Wittwer leaves Central HR and UC seeks her replacement.

On November 1, 2017, Wittwer became the HR applications specialist. This new position was in UC's Business Core Systems (BCS), and not in the Compensation Department or Central HR. (Doc. 23 at ¶ 42.) There was some disagreement between

Stidham and Grunow about how to fill Wittwer's vacancy in the Compensation Department.  Stidham sent Grunow a draft job posting for a senior compensation analyst position that listed the minimum qualifications as: "Bachelor's degree with three (3) years of experience; -OR-Associate's degree with five (5) years of experience; -OR-seven (7) years of related experience.  Experience should be in Compensation and current analytical technology."  (Doc. 12, Ex. 24 at PageID# 129-30, 299, 301.)  On November 7, 2017, Grunow told Stidham that the senior compensation analyst posting "looks good, with one edit–please remove 'should be' as we want compensation experience required and then this is ready to post."  In other words, Grunow clarified that, if an applicant did not have a degree, seven years of compensation experience was required.  (Doc. 12, Ex. 24 at PageID# 129-30, 299, 301.)  Although Plaintiff suggests that it is unclear whether removing "should be" makes compensation experience required or preferred (Doc. 12 at PageID# 129), Grunow's November 7th email makes it clear that compensation experience was a prerequisite: "we want compensation experience required" (Doc. 12, Ex. 24 at PageID# 299.)  Plaintiff conceded that he did not have seven years of compensation experience as of November 7, 2017:

> Q.    In any case as of November 7, 2017, you did not have seven years of experience in compensation, true?
>
> A.    I had—seven years in Compensation, no, I did not have seven years in Compensation.

(Doc. 12 at PageID# 129-30.)

Plaintiff asserts that his previous experience as a benefits administrator at Children's Hospital and a benefits coordinator at Buck Consulting was similar or

related to compensation work.  (Doc. 12 at PageID# 174, 180.)  There is no evidence, however, that Grunow knew about the nature of Plaintiff's prior experience in November 2017.

On November 13, 2017, Grunow emailed Stidham and told him to hold off on posting the senior compensation analyst position because she wanted to ensure that the new position could fill in "the gaps needed for HR Central and our future Job Profiler and PM projects." Grunow ultimately posted for a senior compensation & performance analyst position, which had a higher pay grade, reported directly to Grunow, and required a bachelor's degree.  (Doc. 12, Exs. 25-26 at PageID# 130-31, 133-34, 303-305.)

### K.  Plaintiff submits complaint regarding sex and race discrimination.

On November 8, 2017, Plaintiff emailed Grunow complaining about sex and race discrimination.  (Doc. 12, Ex. 29 at PageID# 144, 327-330.)  Grunow asked Stidham for information about Plaintiff's and Wittwer's salary history, including their initial salaries which predated her employment at UC, and she scheduled a meeting with Plaintiff the following Monday to discuss his complaint.  Plaintiff cancelled that meeting because he wanted to "determine if I need a third party representative present."  (Doc. 12, Ex. 30-32 at PageID# 331-336.)   Plaintiff decided that Stidham would be his third-party representative, and Plaintiff and Stidham met with Grunow on November 14.  (Doc. 12 at PageID# 146, 150.)

### L.  Plaintiff files a charge against Grunow with UC's OEOA.

Also on November 14, 2017, Plaintiff filed a complaint with UC's Office of Equal Opportunity & Access (OEOA) and the OEOA Executive Director Matt Olovson,

claiming that Grunow had discriminated against him because of his race and sex and retaliated against him for his November 8th complaint by changing the senior compensation analyst job to a senior compensation & performance analyst job that required a bachelor's degree, which he did not have. (Doc. 12, Exs. 35-36 at PageID# 151-55, 345-49.)

On March 23, 2018, after a 4-month investigation, Olovson and OEOA investigator Brandon Craig issued a detailed written report concluding that there had been no race or sex discrimination or retaliation. (Doc. 12 at PageID# 154-58; Doc. 12-2 at PageID# 346-410.) At deposition, Plaintiff acknowledged that he told Olovson and Craig that Wittwer was his only comparator—the only employee in a similar position with similar duties. (Doc. 12 at PageID# 155; Doc. 12-2 at PageID# 346-49.)

On March 24, 2018, the day after Olovson and Craig issued their report, Plaintiff filed an EEOC charge, claiming Grunow discriminated and retaliated against him. In his charge affidavit, Plaintiff identified Stidham as his only witness. (Doc. 12 at PageID# 165-66, 169-70; Doc. 12-2 at PageID# 411-414.)

After conducting an equity review recommended by the OEOA, UC increased Plaintiff's salary to $55,000, which Plaintiff admits was fair. In June 2019, Plaintiff resigned from UC to take a higher paying job at UC Health. (Doc. 12 at PageID# 167-69.)

**M. Plaintiff brings this action against UC.**

On August 6, 2018, Plaintiff filed the original complaint in this action. (Doc. 1.) The current complaint is Plaintiff's Amended Complaint filed October 9, 2018. Plaintiff

alleges five claims against UC: (1) violation of the Equal Pay Act, (2) retaliation under the Equal Pay Act, (3) race discrimination under Title VII, (4) gender discrimination under Title VII, and (5) retaliation under Title VII. (Doc. 4.) UC moves for summary judgment on all of Plaintiff's claims.

## LEGAL STANDARD

Rule 56 of the Federal Rules of Civil Procedure provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). Alternatively, summary judgment is denied "[i]f there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Hancock v. Dodson*, 958 F.2d 1367, 1374 (6th Cir.1992) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986)).

The party seeking summary judgment has the initial burden of informing the court of the basis for its motion and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file together with the affidavits which it believes demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The burden then shifts to the nonmoving party who "must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 250 (quoting Fed. R. Civ. P. 56(e)). Once the burden of production has shifted, the party opposing summary judgment cannot rest

on its pleadings or merely reassert its previous allegations. It is not sufficient to "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Rule 56 "requires the nonmoving party to go beyond the [unverified] pleadings" and present some type of evidentiary material in support of its position. *Celotex Corp.*, 477 U.S. at 324.

In determining whether a genuine issue of material fact exists, a court must assume as true the evidence of the nonmoving party and draw all reasonable inferences in the favor of that party. *Anderson*, 477 U.S. at 255. If the parties present conflicting evidence, a court may not decide which evidence to believe by determining which parties' affirmations are more credible. 10A *Wright & Miller, Federal Practice and Procedure*, § 2726. Rather, credibility determinations must be left to the factfinder. *Id.* However, the mere existence of a scintilla of evidence in support of the nonmoving party is not sufficient to avoid summary judgment. *Anderson*, 477 U.S. at 252. "There must be evidence on which the jury could reasonably find for the plaintiff." *Id.* The inquiry, then, is whether reasonable jurors could find by a preponderance of the evidence that the nonmoving party is entitled to a verdict. *Id.*

## ANALYSIS

### A. Plaintiff's Wage Discrimination Claims (Counts I, III and IV).

Title VII of the Civil Rights Act of 1964 precludes employers from "discriminat[ing] against any individual with respect to [his] compensation, terms, conditions, or privileges of employment, because of such individual's race, color,

religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). Whether a wage-discrimination claim alleges unequal pay on the basis of race and/or sex under Title VII or the Equal Pay Act ("EPA"), courts generally apply the same analytical framework. *County of Washington v. Gunther*, 452 U.S. 161, 168 (1981) (Bennett Amendment incorporates the EPA's affirmative defenses into Title VII); *Lacey v. Robertson*, 2000 WL 876491 (6th Cir.) (applying same analysis to EPA claim and Title VII wage claim); *Odomes v. Nucare, Inc.*, 653 F.2d 246, 250 (6th Cir. 1981) (same); *Bridgeman v. City of Bedford Heights*, 2019 WL 1469381, *9-10 (N.D. Ohio) ("To the extent that Plaintiff is asserting a Title VII discrimination claim based on race and sex as to her pay, the plausibility of that claim will be addressed with Plaintiff's Equal Pay Act claim ... [T]he analysis of an unequal pay claim is essentially the same under both the Equal Pay Act and Title VII."). To establish a prima facie case of wage discrimination, a plaintiff must show that: (1) he was a member of a protected class; (2) an employee outside his protected class was paid more; (3) that employee performed equal work. *Warf v. U.S. Dep't of Veterans Affairs*, 713 F.3d 874, 881 (6th Cir. 2013).

The EPA prohibits employers from paying an employee at a rate less than that paid to employees of the opposite sex for equal work. *Buntin v. Breathitt Cty. Bd. of Educ.*, 134 F.3d 796, 799 (6th Cir.1998); *Beck-Wilson v. Principi*, 441 F.3d 353, 359 (6th Cir. 2006). In *Schleicher v. Preferred Sols., Inc.*, 831 F.3d 746 (6th Cir. 2016), cert. denied, 137 S. Ct. 531 (2016), the Sixth Circuit reiterated the three-step burden-shifting framework applicable to the Court's analysis under the EPA. First, the plaintiff can establish a prima facie EPA claim by demonstrating that an employer pays different wages to

14

employees of the opposite sex for equal work.  *Id*. at 752 (citing *Beck–Wilson*, 441 F.3d at 359) (internal citation omitted).  However, unlike the showing required for a Title VII disparate treatment claim, proof of discriminatory intent is not required to establish a prima facie case under the Equal Pay Act.  *Id*.

Second, "[o]nce the plaintiff establishes a prima facie case, the defendant must prove that the wage differential is justified under one of the four affirmative defenses set forth under § 206(d)(1) of the Equal Pay Act: (1) a seniority system; (2) a merit system; (3) a system which measures earnings by quantity or quality of production; or (4) any other factor other than sex."  *Beck-Wilson*, 441 F.3d at 360 (citing 29 U.S.C. § 206(d)(1) and *Buntin*, 134 F.3d at 799) (emphasis added).  Under the EPA, a defendant bears both the burden of persuasion and production on its affirmative defenses.  *Beck–Wilson*, 441 F.3d at 364–65.  Thus, as the party who bears the burden of proving its affirmative defense, when a defendant makes a motion for summary judgment, the defendant must demonstrate that there is no genuine issue as to whether the difference in pay is due to a factor other than sex.  *Id*.  As the *Beck-Wilson* Court explained, unlike a Title VII case in which a defendant need only assert a legitimate, non-discriminatory reason for the different treatment afforded the plaintiff as compared to her similarly situated male co-workers, under the EPA, a plaintiff "never bears the burden of persuasion regarding the affirmative defenses."  *Id*.

Third, only if the defendant proves its affirmative defense, must the plaintiff come forward with some evidence raising an inference of pretext.  *Timmer v. Mich. Dep't of Commerce*, 104 F.3d 833, 844 (6th Cir. 1997).  Summary judgment for the defendant is

proper only where the record shows that it established the affirmative defense "so clearly that no rational jury could have found to the contrary." *Schleicher*, 831 F.3d at 753 (internal quotes omitted).

### 1. Plaintiff's Prima Facie Claim.

UC does not dispute that Plaintiff can establish a prima facie claim of wage discrimination based on a comparison between Plaintiff's employment and Wittwer's employment at UC. Plaintiff and Wittwer performed substantially similar jobs, but Plaintiff was paid significantly less than Wittwer.

Plaintiff does not contend that he can establish a prima facie claim based on any other comparator. (Doc. 33 at PageID# 1818.) Therefore, to the extent he originally sought to assert such claims, they are dismissed.

### 2. UC's Non-Discriminatory Reason for Pay Differential.

Once Plaintiff has established a prima facie claim, the burden shifts to UC to prove that the difference between Plaintiff's and Wittwer's wages was justified based on factors other than his sex or race. Here, UC asserts that it paid Wittwer more than Plaintiff based on the following factors: length of service at UC, education, Wittwer's higher previous UC salary, Wittwer's initial hiring negotiations, UC's sex- and wage-neutral wage/promotion policy, and performance evaluations.

When Stidham hired Plaintiff as a compensation analyst in October 2013, he had been employed at UC approximately two years as a benefits generalist and did not have a bachelor's degree. In contrast, Wittwer began working at UC in 2004 and earned her bachelor's degree from UC in 2006. When she was hired as a compensation analyst in

16

July 2015, she had been employed at UC for over 10 years. Her salary as a senior HR coordinator was $48,066.48 and she told Stidham that she would not take the compensation analyst job for less than $53,000 per year. UC's internal policy requires that promotions be accompanied by no less than a 5% increase in salary. Wittwer's salary, before accepting the compensation analyst position, was already more than Plaintiff's. All of the evidence in the record also supports UC's assertion that Wittwer was simply a much stronger, more productive employee than Plaintiff—as demonstrated by her performance evaluations, bonus payments and career trajectory.

Courts in the Sixth Circuit have recognized these factors as legitimate justifications for a pay disparity. *See Murphy v. Ohio State Univ.*, 549 Fed. Appx. 315, 319 (6th Cir. 2013) (years of service as dispatcher was a legitimate factor other than sex which justified starting wage disparity); *Balmer v. HCA, Inc.*, 423 F.3d 606, 612-13 (6th Cir. 2005) ("A wage differential based on education or experience is a factor other than sex for purposes of the Equal Pay Act. Consideration of a new employee's prior salary is allowed as long as the employer does not rely solely on prior salary to justify a pay disparity."), *abrogated on other grounds by Fox v. Vice*, 563 U.S. 826 (2011); *Lacey v. Robertson*, No. 99-1424, 2000 WL 876491, at *3 (6th Cir. June 21, 2000) ("An employer's decision to pay more educated employees more money is not discrimination…."); *EEOC v. Home Depot*, No. 4:07cv0143, 2009 WL 395835, at *12 (N.D. Ohio Feb. 17, 2009) ("Romine was able to negotiate and command a higher starting rate of pay … [and this] coupled with almost a decade more seniority with Home Depot than Kolarik … account for the wage differential between Romine and Kolarik."); *Lewis v. Oklahoma*, 42 Fed.

Appx. 160, 172-73 (10th Cir. 2002) (employer's policy of not increasing employees' salaries upon promotion if their salary is already higher than the entry level salary for the new position is a legitimate factor other than sex that justifies pay disparity); *Engelmann v. Nat'l Broadcasting Co.*, No. 94 CIV. 5616, 1996 WL 76107, at *10 (S.D.N.Y. Feb. 22, 1996) ("Salary retention policies that maintain an employee's salary even when he or she is transferred to another position within the company also are permissible. … That type of policy rewards longevity of service … Salary matching – payment of a higher salary to match an incoming employee's previous earnings – also is a valid reason for wage differences.").

In response, Plaintiff argues that there is no evidence that Wittwer's education, salary negotiations, or length of service were taken into consideration when she was hired. Rather, according to Plaintiff, these factors are merely post-hoc rationalizations made after he complained of discrimination. Plaintiff points out, for example, that UC was unable to provide Wittwer's resume or the job application that she submitted when offered the compensation analyst role. The Court is not aware of any rule requiring contemporaneous evidence of an employer's reasons for hiring an employee or paying her a certain salary in a wage discrimination case. Perhaps Plaintiff could argue that UC's evidence deserves less weight because of its origin, but it is still sufficient to establish its affirmative defense.

Plaintiff also contends that his claims are not based on the fact that Wittwer received a higher starting salary than him, but "are based on Defendant's discriminatory refusal to adjust [his] salary after Wittwer was hired to perform the same

job as [him]."  (Doc. 33 at PageID# 1819.)  He argues that conflicts between Stidham's and Grunow's testimony regarding this issue preclude summary judgment.  Namely, Stidham testified that he told Grunow about Plaintiff's request for a market-adjustment to his salary in 2015 and, at that time, explained why Wittwer was making approximately $10,000 more than Plaintiff.  (Doc. 14 at PageID# 627.)  In contrast, Grunow testified that, when approached about Plaintiff's request, Stidham simply said that Plaintiff wanted more money without further explanation.  (Doc. 20 at PageID# 907, 1003-04.)  The fact that Stidham recalls a more detailed conversation than does Grunow, however, does not amount to a conflict.

Moreover, Grunow explained to Stidham why she decided not to grant Plaintiff's request for an equity increase:  "The 2015 equity increase was not supported by you [Stidham] or me due to performance, production and error concerns that were brought to my attention.  Also[,] an insufficient rating was documented that year due to these continued concerns."  (Doc. 20 at PageID# 885, 923; Doc. 23 at PageID# 1312, 1334-50; Doc. 14-1 at PageID# 765.)  Plaintiff's performance concerns are well-established in the record.  It is undisputed, for example, that certain business units approached Wittwer to correct Plaintiff's errors.  (Doc. 23 at ¶¶ 14-15, 18-19, 21.)  UC has met its burden of proving that non-discriminatory factors were responsible for its decision to pay Wittwer more—both when she was hired and after Plaintiff requested an equity adjustment.

### 3.    UC Has Established its Affirmative Defense Beyond Reasonable Dispute and Plaintiff Cannot Show Pretext.

At this stage, in order for Plaintiff's EPA claim to survive, he must produce

evidence from which a reasonable juror could find that UC has not met its burden on its affirmative defense. *See Beck-Wilson*, 441 F.3d at 365. As to the Title VII claim, however, Plaintiff bears the burden of showing the existence of a genuine issue concerning pretext—that the actual reason for the pay differential was Plaintiff's sex or race, not UC's stated reasons. *Rogers v. Bridges Rehab. Servs. LLC*, No. 1:18-cv-728, 2019 WL 5731016, at *5 (N.D. Ohio Nov. 5, 2019). Here, Plaintiff has neither produced evidence sufficient to create a genuine issue as to his EPA claim nor shown that a reasonable juror could find UC's reasons for the pay differential were pretextual.

Plaintiff cites the following facts to meet these burdens:

- In a November 2017 email to Grunow, Stidham wrote that the former Interim Chief HR Officer approved Wittwer's $53,000 salary as a compensation analyst because she "came with outstanding recommendations and the planned compensation was $53k per year." (Doc. 20-1 at PageID# 1105.)

- Stidham testified that Wittwer had no prior experience in compensation at the time she was hired and there is no evidence that Stidham considered her bachelor's degree when setting her starting salary. (Doc. 20-1 at PageID# 1105; Doc. 12-1 at PageID# 243 (not much experience in compensation), 247, 256.)

- Wittwer was a student intern at UC for four of the years included in UC's assertion that she "began working at UC in 2004." (Doc. 20-1 at PageID# 1127-29.)

- Grunow testified that she understood a promotion to be a step up a career ladder within a department. (Doc. 20 at PageID# 965-66.) For example, a promotion would occur if an employee moved from a "Benefits 1" classification to "Benefits 2." (*Id.*) A move from one department into another department into a position that required a different skill set would not be a promotion. (*Id.*) Plaintiff therefore reasons that UC's policy requiring a 5% raise for any promotion did not apply to Wittwer's starting salary in the compensation department. (Doc. 14-1 at PageID# 367.)

- Stidham testified that whether an employee is meeting expectations is not a prerequisite to obtaining an equity adjustment of the employee's salary based upon an external or internal market review. (Doc. 14 at PageID# 622.)

- UC allegedly "cherry-picked" facts to justify the refusal to increase Plaintiff's salary. (Doc. 33 at PageID# 1823.) For example, UC credited Wittwer's experience with the relevant software when justifying her starting salary but disregarded Plaintiff's HR and compensation experience when passing him over for the Senior Compensation Analyst position. (*Id.*, citing Doc. 20 at PageID# 892, 961-62, 1002, 1015 and Doc. 26 at PageID# 1379.)

- Plaintiff's performance during FY 2017 improved, as reflected by his review dated June 1, 2017. (Doc. 12-2 at PageID# 275-76 (showing ratings of "M" for "Meets Expectations" in all categories).)

- Grunow reclassified other female employees in the HR department—besides Wittmer—into new and/or higher positions with significant salary increases. (Doc. 20-1 at PageID# 1130-34.) One of those employees was African-American and none of them was male.

- Plaintiff was not given the Senior Compensation Analyst position even though other HR employees were reclassified who did not meet minimum qualifications. (Doc. 33-1 at PageID# 1839-41.)

Through these facts, Plaintiff attempts to manufacture contradictions in UC's narrative or create uncertainty regarding the sincerity of UC's stated reasons for paying Plaintiff less than Wittwer. He accomplishes neither.

Plaintiff argues, for example, that any justifications for Wittwer's starting salary beyond the two mentioned in Stidham's November 2017 email summary must be fabricated. It does not logically follow that Stidham's citation to only two justifications would preclude the possibility of any other justifications for Wittwer's salary. In addition, none of the additional justifications cited by UC (length of service, education, higher previous salary, hiring negotiations, promotion policy) contradict the two cited

by Stidham (outstanding recommendations and budgeted compensation for the position).

Plaintiff's objection to the assertion that Wittwer had worked at UC for 14 years, when she was a student intern for four of those years, also does not amount to a genuine issue. It is not irrational for UC to include those four years in its tally of Wittwer's years of employment at UC. A student intern gains familiarity with UC's systems, albeit not as much as a full-time employee. In addition, even excluding those four years, Wittwer still had ten years of employment at UC. Ten years is a substantial period of time; her length of employment therefore remains a valid consideration in UC's decision to hire Wittwer at her negotiated salary.

Plaintiff also cites Grunow's testimony that Wittwer's hiring did not constitute a promotion. (Doc. 14-1 at PageID# 367.) Grunow was not the HR Director, however, when Wittwer was hired. Grunow did not know whether the people who hired Wittmer had the same understanding of a promotion as she did. Conversely, Stidham, who was involved in hiring Wittwer, understood Wittwer's new position in HR to be a promotion. Stidham also stated that Wittmer demanded a salary of $53,000 as a condition of accepting the job. In sum, Grunow's testimony does not support any inference regarding the reasoning behind Wittwer's starting salary.

Stidham's testimony that an employee's performance information is not required to review his salary for an equity adjustment also does not undermine UC's affirmative defense. UC's pay equity adjustment policy "says that an employee's overall performance rating and scope of responsibility in addition to budget, internal and

22

external market and current placement in salary range may have a direct impact on current salary and the ability to receive a salary equity review and adjustment." (Doc. 23 at PageID# 1282.) The evidence establishes that, regardless of whether Stidham believed it was required, the decisionmaker responsible for determining whether to increase Plaintiff's salary did consider his performance. (*See*, *e.g.*, Doc. 20 at PageID# 923; Doc. 14-1 at PageID# 765.)

Plaintiff next argues that UC "cherry-picked" certain facts to justify refusing Plaintiff's request for an equity increase while crediting the same facts when assessing Wittwer's career. He points out Wittwer's SAP software experience, which Grunow said enabled Wittwer to consult with UC's complex business units. (Doc. 20 at PageID# 892.) Plaintiff contrasts UC's valuation of Wittwer's experience with its alleged disregard of his experience with respect to the senior compensation analyst role in 2017. Plaintiff conceded at deposition, however, that he did not have the seven years of compensation experience required for that position. The fact that he now argues his prior work experience should have been credited is immaterial because there is no evidence that he made that argument to Grunow or anyone else at UC in 2017.

Plaintiff also claims that he was not given credit for the improvement in his performance during 2017. But, even with that improvement, he was not performing on the same level as Wittwer. Wittwer received superlative reviews and was highly valued by her supervisors and the business units that she served. Plaintiff moved from "Inconsistent" ratings in 2016 to "Meets Expectations" in 2017. The feedback regarding goals and professional development for Plaintiff included "continue pursuit of

Undergraduate Degree," ensuring that entries for staff positions below Vice President have "an associate and complete job description," and "continue to improve on compensation tools such as Excel skills (pivot tables) and becoming increasingly comfortable with training—AND—public speaking." (Doc. 12-2 at PageID# 277.) Any suggestion that Plaintiff's improvement put him on par with Wittwer, and so entitled to him to the same compensation, is not supported by the record.

Lastly, Plaintiff identifies other HR employees, in addition to Wittwer, who were promoted and given salary increases. He argues that because none of those employees was male and only one was African-American, their promotions and raises support an inference of sex and race discrimination. They do not. Plaintiff has not shown that any of these other employees were similarly-situated to him for purposes of his discrimination claims. To the contrary, in making his prima facie case, Plaintiff relies on only Wittwer as a comparator. The other employees' employment histories are therefore irrelevant. *See Conti v. Universal Enters., Inc.*, 50 F. Appx. 690, 699 (6th Cir. 2002) (plaintiff bringing a wage discrimination claim must show that employees perform equal work that requires substantially equal skill, effort, responsibilities, and working conditions); *Lacey v. Robertson*, 2000 WL 876491 (6th Cir. June 21, 2000) (affirming summary judgment on EPA and Title VII wage discrimination claims because plaintiff did not offer evidence that he and his claimed comparators with higher salaries were similarly-situated).

As UC met its burden of establishing its affirmative defense and Plaintiff has not met his burden under the EPA or Title VII, Plaintiff's wage discrimination claims must

be dismissed.

###### B.    Plaintiff's retaliation claims (Counts II and V) must be dismissed.

Plaintiff alleges that Grunow retaliated against him by pulling the senior compensation job posting after he complained to her and later posting a higher-level job that required a bachelor's degree—which Plaintiff did not have.  (Doc. 12 at PageID# 134-36.)  To establish a prima facie case of retaliation under either the EPA or Title VII, a plaintiff must show: (1) that he engaged in protected activity; (2) that the defendants knew he exercised protected rights; (3) that as a result of his exercise of protected rights the defendants took employment action adverse to plaintiff; and (4) that there was a causal connection between the protected activity and the adverse employment action. *Johnson v. Univ. of Cincinnati*, 215 F.3d 561, 578 (6th Cir. 2000).

Here, UC argues that Plaintiff's retaliation claims fail for two reasons.  First, it argues that Plaintiff cannot show a causal connection between Plaintiff's complaints of discrimination and Grunow's decision not to hire him for the new position.  Second, UC argues that it cannot be held liable for its hiring decision because it "reasonably and honestly" relied on Plaintiff's representation that he had only two years of compensation experience and therefore was not qualified for the position.  (Doc. 26 at PageID# 1380, quoting *Wilson v. Cleveland Clinic Foundation*, 579 Fed. Appx. 392, 405 (6th Cir. 2014).)  UC is correct on both counts.

In order to prove a prima facie case, Plaintiff must show that he was denied the position because of his protected activity.  When Plaintiff made his complaints, however, Grunow had already established the qualifications for the position—which

Plaintiff could not meet.  On November 7, 2017, Grunow made clear that seven years' compensation experience was required if an applicant for the senior compensation analyst job did not have a degree.  (Doc. 12-2 at PageID# 299-301.)  As of that date, Plaintiff had neither a degree nor seven years' compensation experience.  Therefore, as of November 7, 2017, Plaintiff was not qualified for the senior compensation analyst position.  On November 8, 2017, Plaintiff emailed Grunow his complaints of sex and race discrimination.   (Doc. 12 at PageID# 144, 327-330.)   There can be no causal connection between his complaints and what Grunow did the day before.

Later in November 2017, when Grunow further heightened the requirements for the role, it was concomitant with her changing the role to fill in "the gaps needed for HR Central and our future Job Profiler and PM projects."  (Doc. 12 at PageID# 130-31, 133-34, 303-305.)   It bears repeating that there can be no causal connection when Plaintiff was already unqualified for the earlier position.  In addition, as UC notes, it cannot be held liable for denying Plaintiff a position that it believed in good faith he was not qualified for.  *See Wilson v. Cleveland Clinic Foundation*, 579 Fed. Appx. 392, 405 (6th Cir. 2014) ("When an employer reasonably and honestly relies on particularized facts in making an employment decision, it is entitled to summary judgment on pretext even if its conclusion is later shown to be mistaken, foolish, trivial, or baseless."); *Brown v. First Citizens Bank*, 47 F. Supp. 2d 648, 654 (D.S.C. 1998), aff'd, 173 F.3d 849 (4th Cir. 1999) ("Whether or not Plaintiff believes these qualifications are equivalent, the Bank sets the qualifications it requires for a job vacancy. When the Bank states, as it did in this case, that branch management and not merely branch supervisor experience is

required, then Plaintiff simply does not meet the minimum requirements."). For both of these reasons, UC is entitled to summary judgment on Plaintiff's retaliation claims.

## CONCLUSION

For the reasons above, the Court **GRANTS** Defendant's Motion for Summary Judgment (Doc. 26). This case shall be **TERMINATED** on the Court's docket.

**IT IS SO ORDERED.**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO

By: _____

JUDGE MATTHEW W. McFARLAND